S & R CHEVROLET CO., Inc. v. BIRMING-HAM, Collector of Internal Revenue.

Civ. No. 593.

United States District Court
N. D. Iowa W. D.
Aug. 14, 1950.

Frank J. Enbusk and John A. Senneff, Mason City, Iowa, for plaintiff.

William B. Danforth, Asst. U. S. Dist. Atty., Sioux City, Iowa, and Ruppert Bingham, Special Asst. to the Atty. Gen., for defendant.

GRAVEN, District Judge.

### Findings of Fact

1. This is an action for the recovery of federal income taxes claimed to have been erroneously and illegally assessed and collected for the calendar year 1946.

2. The defendant, E. H. Birmingham, was and is the duly appointed, qualified and acting Collector of Internal Revenue for the District of Iowa. The said defendant is a resident of the City of Sioux City, Woodbury County, Iowa. Woodbury County is in the Northern District of Iowa.

3. The plaintiff, S & R Chevrolet Co., Inc., is a corporation duly organized and existing under and by virtue of the laws of the State of Iowa with its principal place of business presently located in the City of Mason City, Cerro Gordo County, Iowa. Cerro Gordo County is in the Northern District of Iowa.

4. On or about March 15th, 1947, the plaintiff corporation filed with the defendant herein its corporation income tax return for the calendar year 1946 disclosing net income of $23,572.87 and an income tax liability thereon of $5,393.22. During the year 1947 plaintiff paid this income tax liability in the said sum of $5,393.22.

5. Subsequent to the filing of the income tax return for the calendar year 1946 and the payment of the tax shown due thereon, an Internal Revenue Agent examined the return and proposed a deficiency assessment in the amount of $14,226.18. This deficiency assessment was based upon an adjustment in the net income of the plaintiff as follows:

| | |
|---|---|
| Net income as disclosed by return | $23,572.87 |
| As adjusted | 51,629.99 |
| Net adjustment | $28,057.12 |

6. This net adjustment in plaintiff's income of $28,057.12 was composed of unallowable deductions and additions to income in the following amounts and in respect to the following items:

| | |
|---|---|
| Life insurance premiums | $ 292.68 |
| Accrued taxes | 71.37 |
| Reserve for used cars | 5,649.75 |
| Salaries | 22,043.32 |
| Net adjustment (addition to income) | $28,057.12 |

There is no dispute in this action in regard to the matters of the life insurance premium or the accrued taxes. The addition to income of the amount of $5,649.75 in connection with the item of Reserve for used cars was based upon the following adjustments by the Internal Revenue Agent:

Reserve per books 12-31-46 $6,055.53
Adjusted reserve 12-31-46 275.00

$5,780.53
Less: Adjustment to reserve 12-31-45 130.78
Restored to income $5,649.75

The addition to income of the amount of $22,043.32 in connection with the item of salaries was based upon the following adjustment by the Internal Revenue Agent:

| | Salary | Christmas Bonus | Year End Bonus | Total Claimed | Allowed |
|---|---|---|---|---|---|
| Sam Rozen— Pres. & Treas. | $ 3,600.00 | | $12,123.75 | $15,723.75 | $15,723.75 |
| Robt. Laughlin— Vice President | 2,400.00 | | 4,041.25 | 6,441.25 | 6,441.25 |
| Keith Rozen— Sales Manager | 3,600.00 | $ 50.00 | 6,735.41 | 10,385.41 | 5,050.00 |
| Francis Rozen— Parts Manager | 2,550.00 | 50.00 | 6,735.41 | 9,335.41 | 3,592.00 |
| Lloyd Rozen— Service Manager | 2,842.68 | 50.00 | 6,735.41 | 9,628.09 | 3,998.00 |
| John Laughlin— Personnel Mgr. | 3,599.00 | 50.00 | 6,735.41 | 10,384.41 | 5,050.00 |
| Wm. J. Fisher— Secretary | — | — | — | — | — |
| | $18,591.68 | $200.00 | $43,106.64 | $61,898.32 | $39,855.00 |

Total Claimed $61,898.32
Allowed 39,855.00
Restored to income $22,043.32

7. Based upon this addition to plaintiff's 1946 income of $28,057.12, the Commissioner of Internal Revenue imposed a deficiency assessment against the plaintiff in the amount of $14,226.18. On or about June 9th, 1949, the plaintiff paid said deficiency assessment together with interest thereon in the amount of $1,903.18, or a total amount of $16,129.36. On June 10th, 1949, the plaintiff filed a claim for refund thereof, and after more than six months had elapsed, the plaintiff brought this action on February 24th, 1950, for the recovery of the sum of $16,129.36, together with interest and costs as provided by law.

8. The plaintiff corporation was organized by Sam Rozen and Robert Laughlin in 1929 at Emmetsburg, Iowa, for the retail distribution of Chevrolet automobiles and related activities. For a number of years prior to 1929 Sam Rozen had been engaged in the retail distribution of another make of automobile, and at the time of the organization of the plaintiff Robert Laughlin was in the banking business in Emmetsburg. The plaintiff was incorporated for $50,000 (500 shares at $100 per share). Initially the stockholders in the plaintiff were Sam Rozen, Robert Laughlin, a Mr. Stines, a Mr. Clark and William J. Fisher. Mr. Stines sold his stock and withdrew from the corporation in 1929 and Mr. Clark did likewise in 1931. In 1931 Sam Rozen and Robert Laughlin moved to Mason City and also in 1931 the principal place of the business was changed from Emmetsburg to Mason City, where it has

remained since that time. On September 30th, 1944, there were outstanding 500 shares of stock in the plaintiff corporation, being held as follows:

|  | No. of Shares Owned | Percentage Of Total |
|---|---|---|
| Sam Rozen | 373 | 74.6 |
| Robert Laughlin | 123 | 24.6 |
| William J. Fisher | 4 | .8 |
|  | 500 | 100% |

One hundred of the 373 shares of stock under the control of Sam Rozen on September 30th, 1944, had been purchased by him for his sons who were in the armed services. These 100 shares of stock were issued to Sam Rozen personally and there was no actual transfer of said stock to his sons on the books of the corporation until a subsequent year.

9. Since the incorporation of the plaintiff in 1929 and at all times since that date down to and including the period covered in this action, Sam Rozen and Robert Laughlin have guided the affairs of the corporation and been its chief executive heads. The Board of Directors of the corporation throughout the years has consisted of Sam Rozen, Robert Laughlin and William J. Fisher. Sam Rozen at the present time is 57 years of age. Robert Laughlin did not appear as a witness and his age does not appear in the record. William J. Fisher is an attorney at Emmetsburg, Iowa, and has served as secretary of the corporation throughout the years but has apparently taken no active part in the management of the corporation.

10. Keith Rozen, Francis Rozen and Lloyd Rozen are the sons of Sam Rozen, and John Laughlin is the son of Robert Laughlin.

11. Keith Rozen (James A. K. Rozen) was 25 years old in 1946 (29 years of age at the present time). He was graduated from high school in Mason City in 1939 at the age of 18 and entered the employment of the Tamres Automobile Parts Company of Mason City in the capacity of a traveling salesman earning from $45 to $60 per week on a salary and commission basis. He worked about 9 months in this position and then entered the employment of the plaintiff corporation as a retail salesman. In the fall of 1940 he attended a six weeks' school for sales managers and upon graduation from that school he returned to his position as retail salesman with the plaintiff. During the time that he was a retail salesman with the plaintiff, Keith Rozen averaged from $200 to $300 per month, working on a commission basis. He was made assistant sales manager early in 1941 and in the spring of that year was made acting sales manager, continuing in that position until he enlisted in the Army in March of 1942. During 1941 his salary and year-end bonus together amounted to around $5,000. Plaintiff consulted with General Motors often regarding business policies and practices and the hiring of key personnel. The appointment of Keith Rozen as acting sales manager in 1941 was upon approval from the office of the General Manager of the Chevrolet Motor Division of General Motors. In the early part of 1942 a freeze was put on the sale of cars and trucks. Keith Rozen testified to successful efforts on his part as sales manager of the plaintiff to secure new cars from other dealers subsequent to this government freeze order, in order that the plaintiff could meet previous commitments on car sales. Keith Rozen returned from the service in August, 1945. He testified that he had saved between $5,000 and $6,000 and had thought of entering business for himself. However, he returned to work for the plaintiff in October of 1945 as sales manager. During the remaining months of 1945 he received a salary of $300 per month and arrangements were made through Mr. Laughlin and his father,

Sam Rozen, that he would receive the same salary plus 10 per cent of the profits for the year 1946.

12. Francis Rozen was 29 years old in 1946 (33 years of age at the present time). He graduated from high school in Mason City and attended the State University of Iowa at Iowa City, from 1935 to 1939, graduating in the latter year at the age of 22 with a B.S.C. Degree from the Commerce Department. He had worked in a filling station during two of the summer vacation periods while he was attending the State University of Iowa and following his graduation therefrom in 1939 he entered the employ of the plaintiff in the parts department. In the spring of 1940 he attended a Parts School sponsored by Chevrolet Motors Company which lasted a month. He finished second in a class of 25 or 30 attending that school. He returned to the plaintiff corporation following the completion of this school. Sometime during 1940 the parts manager left and he took over as parts manager, continuing in that position until he joined the Army in August, 1942. He was discharged from the Army in March of 1946 and returned to Mason City the first part of April, 1946. He testified that he had received no communication from his father while he was in the service relative to taking a position with the plaintiff. He also testified that he had thought about going into the parts business in some field but he did not know exactly where. He was approached by his father, Sam Rozen, and Robert Laughlin relative to working for the plaintiff and on April 15th, 1946, he re-entered the employ of the plaintiff as parts manager. Sometime between April 5th, 1946, when he returned to Mason City, and April 15th, 1946, when he went to work for the plaintiff, Francis Rozen was approached by his father, Sam Rozen, president of the plaintiff, and offered a salary of $300 per month plus 10 per cent of the profits. Francis Rozen went to work for the plaintiff under that compensation plan, which is hereinafter referred to in greater detail.

13. Lloyd Rozen was 27 years old in 1946 (31 years of age at the present time).

He was graduated from high school in Mason City at the age of 17 and went to work at an oil station for a very short time. In 1936, at the age of 18, he entered the employ of the plaintiff corporation in the parts department where he continued for approximately two years. After that he was transferred out on the floor as assistant service manager in which position he continued until early in 1940 when he became service manager. He remained as service manager until he enlisted in the Army in March, 1942. He returned from the Army in December, 1945, and made an agreement with his father, Sam Rozen, to go to work for the plaintiff at a salary of $75 per week plus 10 per cent of the profits. However, he went to Clear Lake, Iowa, at his father's direction to work in the Chevrolet garage there for the first five months of 1946, returning to Mason City in May of 1946 and resuming his position as service manager of the plaintiff at that time. While he was employed at Clear Lake, he received compensation for his services at the rate of $75 per week from the Clear Lake agency.

14. John Laughlin was 38 years old in 1946 (42 years of age at the present time). He attended public schools in Emmetsburg and also attended Notre Dame University, taking an Arts course. It does not appear how long he attended Notre Dame but he testified that in 1928, at the age of 20, he left Emmetsburg and entered the employ of the Pacific Gas and Electric Company on the West Coast. During his tenure with the Pacific Gas and Electric Company he attended night school for six years studying electrical and oil field engineering. He received several promotions in both position and rank by the Pacific Gas and Electric Company. In November, 1942, he enlisted in the Army retaining his seniority rights in his old position upon his return from service. He testified that the salary in his old position with the Pacific Gas and Electric Company had almost doubled from the $300 per month plus expenses that he had received before entering the service. He also testified that upon his return from the service he had received an

offer from a very successful real estate firm in Bakersfield, California, at a salary of $400 per month plus expenses and 15 per cent of the profits. He further testified that he would have been satisfied to re-enter the employ of the Pacific Gas and Electric Company but that he was approached by Sam Rozen relative to entering the employ of the plaintiff and he did become employed by the plaintiff in January, 1946, as organization manager. Apparently he was employed by the plaintiff in 1946 under a compensation plan similar to that under which Keith, Francis and Lloyd Rozen were employed—$300 per month plus 10 per cent of the profits.

During the year 1946 Sam Rozen served as president and general overseer of the plaintiff corporation, Robert Laughlin was vice president and credit manager, and William J. Fisher was secretary.

15. On January 2d, 1946, at the annual meeting of the stockholders of the corporation, the following action was taken:

"SECRETARY'S MINUTES

"S & R Chevrolet Co.

"Jan. 2nd, 1946 The Annual Meeting of the Stockholders was held in the office of the Corporation at its office in Mason City, Iowa, and all of the Stockholders were present, and by a vote of all of the stockholders, and by an unanimous vote the Board of Directors were re-elected to their old positions and the Salary and Labor Compensation of the officers was voted to be the same as it was in 1945. That the stockholders on the recommendation of the Board of Directors voted that Francis Rozen, Keith Rozen, Loyd [Lloyd] Rozen and John Laughlin were to receive 10% of the net profit of the S & R Chevrolet Company in addition to their salaries. That the Board of Directors in the presence of all of the stockholders, before the meeting was adjourned suggested that Robt. Laughlin be made Vice President of the S & R Chevrolet Company and the same being presented and voted upon by a full vote of all the Stockholders Robt. Laughlin was duly elected to the office of Vice President

with full powers under the Corporation Articles.

"/s/ Sam Rozen
/s/ Robt. Laughlin
/s/ Wm. J. Fisher
"Attest /s/ Wm. F. Fisher Secy."

The Board of Directors also fixed the regular salaries of Keith Rozen, Francis Rozen, Lloyd Rozen and John Laughlin at $300 per month for the year of 1946, these salaries to be in addition to the 10 per cent of the net profit of the plaintiff which each was to receive.

16. As noted above, Keith Rozen was 25 years of age in 1946, he had had a high school education, had completed a short trade school course, and had approximately 3 years' experience with the plaintiff. He served the entire year of 1946 as sales manager of the plaintiff, having charge of the new and used car and truck sales and the supervision of salesmen. It also appears that he did some work in connection with, and in checking, the financing of cars. During 1946 he had two salesmen working for him, one on a salary and commission and the other on a straight salary. A Mr. Douglas Gillard was a salesman on a salary of $250 per month plus a bonus of $25 on all new trucks sold and $10 on all special truck bodies sold. There was some dispute in the testimony as to Mr. Gillard's total compensation for 1946, but John Laughlin testified from a book entitled "Employee Records" that Mr. Gillard received compensation in the amount of $3,050 for the year 1946. Mr. Ed Berlin was a salesman working for a straight salary of $200 per month for the year 1946. There was testimony to the effect that new cars were difficult to secure during the first few months of 1946 but that they started coming through better after that and that there were few selling problems during 1946 because of the great demand for new and used cars.

17. As noted above, Francis Rozen was 29 years of age in 1946, he had a high school and college education, had completed a trade school course and had approximately 3 years' experience in the plaintiff cor-

poration. He served 8½ months of the year 1946 as parts manager of the plaintiff, being responsible for the buying and selling and the sales promotion of parts and accessories. He testified of specific instances concerning his efforts and success in getting parts. Sam Rozen also testified in this regard. It appears that parts were difficult to get in the early part of 1946, but that they were coming through better the latter part of 1946. During 1946, in addition to Francis Rozen as parts manager, there were two full-time and one part-time men employed in the parts department. Francis Rozen testified that the assistant parts manager worked on a salary of $40 per week plus two per cent of the sales and was averaging $300 to $400 per month in 1946; that the other full-time parts man was making $200 per month during that year and the assistant man was making $12 per week.

18. As noted above, Lloyd Rozen was 27 years of age in 1946, he had a high school education and had approximately 6 years' experience in the plaintiff corporation, part of said 6 years being spent in the parts department and part in the service department. He served approximately 7 months of the year 1946 as service manager of the plaintiff, having full charge of the repair and body shop, supervising workmen therein and handling customer relations connected therewith, and was responsible for the repairing of new and used cars and the servicing of new cars as well as directly assisting with the sale of parts and the sale of new cars. During 1946 there were employed in the service department an assistant manager, a body foreman, two body men and eight mechanics. Lloyd Rozen testified that during 1946 the assistant manager of the service department received from $350 to something over $400 per month, that the mechanics would average from $70 to $75 per week with some of the mechanics receiving all the way from $65 to $115 per week. It appears the mechanics were paid on the amount of work they did plus a $2.50 per week bonus plus a commission on accessories sold.

19. As noted above, John Laughlin was 38 years of age in 1946. He had a high school and some college education and had six years of night school engineer training. He had no previous experience with the plaintiff prior to the year in question and had no previous automotive experience. He served during the entire year of 1946 as organization manager. Although it does not clearly appear just what his duties were, he testified that he had charge of the interviewing, hiring and discharging of employees (though his decision was not final in this respect), the coordination of all departments, the control of expenses in the various departments, the survey of the affairs of the business to detect inefficient methods of operation, and the conduct of an employee education program. There was testimony to the effect that the plaintiff owned considerable farm land during 1946 and several witnesses, including Sam Rozen, indicated that John Laughlin helped manage this land but he testified that his activities were confined to the garage and the garage business. It does not appear what assistance, if any, he had in his job.

20. Sam Rozen, president of plaintiff, testified that it had been the practice of plaintiff for a number of years, since the incorporation in 1929, to pay bonuses to "key men" in the organization. The plaintiff introduced into evidence minutes of a stockholders' meeting held May 10th, 1929, which indicated that a Mr. G. A. Barnett was employed by the plaintiff at a salary of $225 per month plus "11 per cent of the net profits of the new car sales after all losses and depreciation have been deducted from the net profits of the used car sales." Sam Rozen testified that in 1932 and 1933 plaintiff employed a Bob Brackett as sales manager on a salary plus 10 per cent of the profits, including farm income, and that "one year he received some bonus, not very much, because we didn't make anything, and next year, he didn't get any, because we made $44 for that year."

21. In 1945 the partnership of Sam Rozen and Robert Laughlin opened a Chevrolet agency at Clear Lake with G. W. (Tommy) Atkins as full-time manager of that agency. There were around six men employed by that agency. Mr. Atkins was employed on the basis of a guaranteed salary of $230 per

month plus the first $70 of the profits after expenses, plus 25 per cent of all additional profits. His salary and commission under this arrangement amounted to approximately $4,500 in 1945 and to $7,885.99 in 1946. An agency was also opened at Sheffield, Iowa, in October, 1948, with a Mr. Ed Beline as manager. He was employed on the basis of a salary of $300 per month plus 25 per cent of the profits. Inasmuch as Mr. Atkins had full charge of the Clear Lake agency and Mr. Beline had full charge of the Sheffield agency, their situations are not analogous to that of John Laughlin and Keith, Francis and Lloyd Rozen whose compensation is involved in this case.

As noted above, the mechanics employed in plaintiff's service department received a small weekly bonus plus a commission on accessories they sold and one of the salesmen received a flat bonus on certain units sold in his department. It does not appear from the record that for the years 1934 through 1946 any employees of the plaintiff other than members of the Rozen and Laughlin families received any bonus or commission based upon a percentage of the entire profits of the business.

22. The following schedule shows the bonus payments to members of the Rozen and Laughlin families for the years 1942–1946 inclusive as compiled from the annual summaries of plaintiff's records introduced in evidence in this case.

| Year | Net Profits before (bonuses and taxes) | | Amount | Bonuses Per cent of Net Profits (Approx.) |
|------|------|------|------|------|
| 1942 | $10,461.78 | S. Rozen— | $ 4,646.18 | 44.41 |
|      |            | R. Laughlin— | $ 2,048.72 | 19.58 |
|      |            |            | $ 6,694.90 | 63.99% |
| 1943 | $19,286.67· | S. Rozen— | $ 8,057.58 | 41.77 |
|      |            | R. Laughlin— | § 5,100.00 | 26.44 |
|      |            |            |            | 68.21% |
| 1944 | $20,285.47 | S. Rozen— | $ 9,046.87 | 44.59 |
|      |            | R. Laughlin— | $ 5,429.72 | 26.76 |
|      |            |            | $14,476.59 | 71.35% |
| 1945 | $17,702.34 | S. Rozen— | $ 7,791.72 | 44.01 |
|      |            | R. Laughlin— | $ 4,711.38 | 26.60 |
|      |            |            | $12,503.10 | 70.61% |
| 1946 | $67,199.03 | S. Rozen— | $12,123.75 | 18.04 |
|      |            | R. Laughlin— | $ 4,041.25 | 6.01 |
|      |            | J. Laughlin— | $ 6,735.41 | 10.02 |
|      |            | K. Rozen— | $ 6,735.41 | 10.02 |
|      |            | F. Rozen— | $ 6,735.41 | 10.02 |
|      |            | L. Rozen— | $ 6,735.41 | 10.02 |
|      | $43,106.64 |            | $43,106.64 | 64.13% |
| Net Profit to Surplus (before taxes) | $24,092.39 | | | |

23. For the year 1946 the net profit before bonuses and taxes, as shown in the above schedule, was in the amount of $67,199.03. The net sales, cost of sales, gross profit, total expenses and operating profit figures for each of the departments in plaintiff's organization as indicated on the 1946 summary statement correspond exactly to those shown

on the financial statement submitted to General Motors for the 1946 calendar year, set out in part below, even including the allocation of administrative expense to each of the four operating departments—new car, used car, service and parts. However, there was included in this summary statement an item of $10,444.10 listed as unabsorbed expense which was not listed on the financial statement to General Motors and there was also an addition to income on the above summary of the amount of $14,337.24 which apparently includes an item of $12,898.82 from farm and miscellaneous income which appears on plaintiff's corporation income tax return for the year 1946, but which does not appear on the financial statement submitted to General Motors for 1946. These two items, the $10,444.10 expense item and the $14,337.24 addition to income which appear only on the summary, result in a figure on the summary representing net profits before bonuses and taxes of $67,-199.03, as compared with a figure of $65,392.38 for the same item on the financial statement to General Motors, and a figure of $67,354.10 which appears in the Internal Revenue Agent's report, hereafter noted.

A copy of a portion of the Internal Revenue Agent's report having to do with the computation of the bonuses to members of the Rozen and Laughlin families was introduced in evidence and appears as follows:

"The bonuses for 1946 were computed as follows:

| | |
|---|---|
| Net profit before taxes and bonuses | $67,354.10 |
| 10% bonus Keith Rozen | (6,735.41) |
| 10% bonus Frances [Francis] Rozen | (6,735.41) |
| 10% bonus Lloyd Rozen | (6,735.41) |
| 10% bonus John Laughlin | (6,735.41) |
| | $40,412.46 |
| 30% bonus Sam Rozen | (12,123.75) |
| 10% bonus Robt Laughlin | (4,041.25) |
| | $24,247.46 |
| Less: Unknown adjustment | 155.07 |
| Net profit to surplus | $24,092.39" |

24. It appears that the net profit before bonuses and taxes figure as contained in this Internal Revenue Agent's report is greater than that contained in the summary, as set out above, in the amount of $155.07. There was no explanation of this item of $155.07 other than it was an "unknown adjustment." The senior accountant who prepared plaintiff's 1946 corporate income tax return testified in regard to that portion of the Internal Revenue Agent's report concerning bonus computations set out above. He indicated that according to that report the 10 per cent bonuses to each of the three Rozen boys and to John Laughlin were calculated first and deducted from the net profit figure and then the 30 per cent bonus to Sam Rozen and the 10 per cent bonus to Robert Laughlin were calculated upon the remainder and deducted therefrom. The senior accountant testified that figures similar to those contained in this report appeared on plaintiff's books but he did not state that this was the procedure that actually was followed in the computation of the bonuses. The bonus received by Sam Rozen was 30 per cent of the net profits remaining after the bonus payments to the three Rozen boys and to John Laughlin had been deducted. It was also an amount equal to 18 per cent of the total net profits before bonuses and taxes as indicated on the Internal Revenue Agent's report. Counsel for the parties agreed as to the amount of the bonus paid Sam Rozen for 1946 but were not in agreement as to whether such bonus was calculated on the 18 per cent basis or the 30 per cent basis. Sam Rozen testified that each year since 1931-1932 he was to receive a bonus of 30 per cent of the profits of the plaintiff under an arrangement with the plaintiff which had been approved each year. There was some discussion as to whether he had only received an 18 per cent bonus in 1946 and had voluntarily relinquished his right to the additional amount. It appears from the Internal Revenue Agent's report and the testimony in connection therewith, however, that the bonus due Sam Rozen for the year 1946 actually was calculated on the basis of 30

per cent of the net profits remaining after 10 per cent bonuses to the three Rozen boys and to John Laughlin had been deducted. An item lending support to this conclusion is the fact that the 10 per cent bonus due Robert Laughlin appears to have been calculated on a similar basis.

25. As to the matter of the salaries paid similar persons engaged in similar businesses, a Mr. Lloyd Cummins who was assistant manager and vice president of the Buick agency in Mason City testified that during 1946 he was on a salary of $250 per month plus 10 per cent of the profits of the business and that he received about $8,000 under that arrangement in that year. Mr. Cummins had been employed by the Buick agency in Mason City since 1929. The sales manager of the Pontiac agency in Mason City, a Mr. Gallagher, received about $180 per month plus 5 per cent of the profits of the business during 1946, his total compensation for that year amounting to some $6,200. Although the testimony was to the effect that new Chevrolet automobiles were difficult to secure during the first several months of 1946, it appears it was even more difficult during that period to secure new Pontiac automobiles. Mr. Gallagher, the sales manager of the Pontiac agency, had been employed by that agency since 1924 and had previously been in partnership with his brother in that agency before they incorporated. The service manager of the Pontiac agency was on a salary and bonus arrangement but received less total compensation in 1946 than the sales manager of that agency. It appears that both Mr. Cummins and Mr. Gallagher had over 20 years' experience in the automobile business. A Chevrolet automobile dealer from Britt, Iowa, who had formerly been connected with the Chevrolet Motors Division of General Motors in various capacities testified in regard to the salaries received by men occupying positions which were allegedly similar to those occupied by the Rozen boys. He testified that service managers of particular Chevrolet agencies in the Des Moines, Iowa, zone were receiving upwards of $1,000 to $1,200 per month in salaries and commissions in the post war period; that a parts manager in the Chevrolet agency in Spencer, Iowa, had been and was still receiving from $700 to $800 per month; that a sales manager in a Fort Dodge, Iowa, agency received $650 per month plus a substantial bonus, said sales manager's compensation aggregating over $10,000 per year. There was no indication from his testimony as to the experience or ability of these particular sales, service, and parts managers or the volume of business or profit of their particular departments or agencies. He indicated that he was acquainted with Keith, Francis and Lloyd Rozen and the type of work they did in 1946 and that in his opinion a salary to each for that year of $10,000 to $12,000 based partly on commissions, was reasonable. Sam Rozen also testified that in his honest judgment a salary to Keith, Francis and Lloyd Rozen and John Laughlin of $300 per month plus 10 per cent of the profits was reasonable and just compensation for the services they rendered plaintiff in 1946.

26. There was considerable testimony in regard to the efforts of Sam Rozen during the war years to secure qualified individuals to manage the various departments of the plaintiff corporation. Sam Rozen testified that before he knew Keith was coming back to take any position he offered to a Mr. Shields who had worked for General Motors the position as sales manager of the plaintiff at a salary of $500 per month plus a bonus of from 7½ to 10% of the profits before tax. Sam Rozen further testified that in 1944 and 1945 he contacted a Mr. S. L. Armstrong who had been in the automobile business since 1925 and who was sales manager of the Buick automobile agency in Mason City at that time and offered him a $500 a month salary plus a bonus when the new cars came out with a minimum salary guarantee then of $15,000, but Mr. Armstrong indicated that he was not interested since he had just quit the garage business. Mr. S. L. Armstrong who appeared as a witness testified to similar offers he had received at about that time from automobile agencies in Fort Dodge, Iowa, and Duluth, Minnesota, and that he had also rejected such offers. It appears that the individuals contacted by Sam Rozen in connection with

employment by the plaintiff corporation were men with long experience in executive capacities in the automobile business.

27. The following schedule indicates the volume of operations in the various departments in the plaintiff corporation and the operating profit for each department as indicated on the plaintiff's financial report submitted to General Motors for the year 1946 and introduced in evidence in this case. Since the new car and the used car departments are considered together under the heading of sales department for purposes of this case, a sub-total of those two departments has been included in the schedule:

|  | New Car | Used Car | (New & Used) (Car Total) | Service | Parts | Total |
|---|---|---|---|---|---|---|
| Net Sales | $281,563.68 | $76,431.06 | ($357,994.74) | $68,589.12 | $85,752.40 | $512,336.26 |
| Cost of Sales | 213,354.71 | 55,141.37 | ( 268,496.08) | 33,711.17 | 54,973.35 | 357,180.60 |
| Gross Profit | $ 68,208.97 | $21,289.69 | ($ 89,498.66) | $34,877.95 | $30,779.05 | $155,155.66 |
| Total Expenses | 33,811.68 | 10,564.33 | ( 44,376.01) | 24,454.73 | 21,448.37 | 90,279.11 |
| Operating Profit | $ 34,397.29 | $10,725.36 | ($ 45,122.65) | $10,423.22 | $ 9,330.68 | $ 64,876.55 |
| Additions to Income |  |  |  |  |  | 1,851.62 |
| Total |  |  |  |  |  | $ 66,728.17 |
| Deductions from Income |  |  |  |  |  | 1,335.79 |
| Net Profit before bonuses and taxes |  |  |  |  |  | $ 65,392.38 |

The following schedule indicates the combined profit per month from the sales, service and parts departments of the plaintiff as indicated on the plaintiff's financial report submitted to General Motors for the year 1946 and introduced in evidence in this case:

| January | $ 813.52 |  |
|---|---|---|
| February | 2,203.43 |  |
| March | 1,548.91 |  |
| April | 2,407.48 |  |
| May | 6,489.46 |  |
| June | 15,510.65 |  |
| Total first six months |  | $28,973.45 |
| July | $16,739.75 |  |
| August | 12,467.12 |  |
| September | 4,934.38 |  |
| October | 7,011.69 |  |
| November | (543.85) |  |
| December | (4,190.16) |  |
| Total last six months |  | $36,418.93 |
| Net Profit before bonuses and taxes |  | $65,392.38 |

It appears from the above schedule that 44.3% of the profits of the business for 1946 were derived during the first six months of that year and 55.7% during the last six months.

It is of interest to note the relationship between the amount of compensation, including salary and bonuses received by Keith, Francis and Lloyd Rozen in proportion to the net operating profit of each of their departments, before the administrative expense was prorated to each department:

|  | Operating Profit | Compensation | Percentage of Compensation To Profit |
|---|---|---|---|
| Keith Rozen (Sales Dept.) | $ 63,839.34 | $10,385.41 | 16% |
| Francis Rozen (Parts Dept.) | 18,378.67 | 9,335.41 | 51% |
| Lloyd Rozen (Service Dept.) | 20,739.29 | 9,628.09 | 46% |
|  | $102,957.30 | $29,348.91 |  |

After the administrative expense was prorated out to these departments the comparison of the compensation received by the three Rozen boys as managers to the operating profits of their respective departments is as follows:

|  | Operating Profit | Compensation | Percentage of Compensation To Profit |
|---|---|---|---|
| Keith Rozen (Sales Dept.) | $45,122.65 | $10,385.41 | 23% |
| Francis Rozen (Parts Dept.) | 9,330.68 | 9,335.41 | 100%+ |
| Lloyd Rozen (Service Dept.) | 10,423.22 | 10,384.41 | 92% |
|  | $64,876.55 | $30,105.23 |  |

28. There was considerable testimony from a number of witnesses, including members of the Rozen and Laughlin families, pointing out and emphasizing the interdependence of the sales department, the service department and the parts department in the plaintiff and similar automotive organizations and how important it is that all three departments work in close interrelation and harmony with each other. There was also testimony to the effect that efficient and well operated parts and service departments would or could make substantial contributions to the volume of business transacted by the sales department. One witness who was a Chevrolet dealer and had formerly been connected with the Chevrolet Motors Division of General Motors was of the opinion that a good shop and service department are the best salesmen a dealer can have. It appears in the present case that the three Rozen boys, Keith, Francis and Lloyd, did cooperate and work together very well in the conduct and management of the departments of the plaintiff corporation of which they had charge. During the time they have been with the plaintiff, they have had excellent reputations for honesty, intelligence, reliability, industry, and ability both in the general community in and around Mason City and also among the members of the automotive industry in and around Mason City.

29. As noted above, there was included in the income reported by plaintiff in its 1946 corporation income tax return and in the amount of profit from the plaintiff corporation upon which bonuses were computed the amount of $12,898.82 labeled "Net Profit From Farms and Misc." It appears from the record in this case that neither Keith, Francis or Lloyd Rozen nor John Laughlin contributed any services toward the production of this farm income for the year of 1946. After deducting the salaries and bonuses paid to the members of the Rozen and Laughlin families, the farm income, and taxes paid the federal government, the plaintiff only realized a return of approximately 6% on its invested capital for the year 1946. This would appear to be an inadequate return considering the general business conditions prevailing in the automotive industry in 1946 and all the circumstances surrounding plaintiff corporation. The record also discloses that the plaintiff did not pay any dividends to stockholders during the years 1941 to 1946 inclusive.

30. Section 23(a) (1) (A) of the Internal Revenue Code, 26 U.S.C.A. § 23(a) (1) (A) provides that in computing net income there shall be allowed as deductions all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable compensation for personal services actually rendered.

There is no controversy in the present case in respect to the fact that Keith, Francis and Lloyd Rozen and John Laughlin did actually render personal services to the plaintiff corporation in the calendar year 1946 and that liability for compensation therefor in the nature of bonuses and salaries which are claimed as deductions by the plaintiff in this case was actually incurred by the plaintiff in that year.

It is authoritatively established in cases of this kind that the plaintiff has the burden of proving that the Commissioner's determination is erroneous. In this case the Commissioner determined that a portion of the compensation received from the plaintiff by each Keith, Francis and Lloyd Rozen and John Laughlin for the calendar year 1946 was excessive and unreasonable and could not be allowed as a deduction by the plaintiff corporation. From all the evidence presented and appearing in the record in this case, it is the view and the finding of the Court that the plaintiff has not sustained the burden of proving that such determination by the Commissioner was erroneous.

31. There is presented in this case the question of the reasonableness of the reserve on used cars set up by the plaintiff at the end of the year 1946. On December 31st, 1946, plaintiff had on hand 56 used cars for which it had paid or allowed the sum of $34,987.89. Each used car was set up at the amount the plaintiff had paid or had allowed the customer as a trade in at the time the plaintiff received the car. At the end of the year the plaintiff would set up a reserve or adjustment against this trade in value at which each car was listed on the plaintiff's books. It appears that the amount of the reserve or adjustment set up for each used car was determined in the following manner. At the end of the year Sam Rozen and the sales manager and the bookkeeper, or just Sam Rozen and the bookkeeper, would go out to the lot and look over each used car in the possession of the plaintiff at that time. They would then decide what the car would bring after it was a year older. In determining this fact they were guided by Sam Rozen's 30 years of experience in the used car business, the prevailing prices of used cars, and also by the figures contained in the Red Book, the National Used Car Market Report. After deciding what the car would be worth, considering the fact that it would be a year older after the first of the year, they subtracted this figure from the trade in value of the car and the difference between those two figures was added to the

reserve for used cars. Sam Rozen testified that the basis for writing the used car values down at the end of the year was that "the car might not bring the money," and that by means of this reserve method they "took a year's protection." It appears that the plaintiff had consistently followed this practice of setting up a revaluation reserve on used cars each year since 1929. Though considerable weight will be given to a consistent method of treating inventories, such long continued practice does not in itself justify the deductions taken and does not preclude the Commissioner of Internal Revenue from attacking such deductions. Although it could not be ascertained with any degree of certainty on December 31st, 1946, as to whether used car prices would move up or down in 1947, yet the fact remains that a considerable number of these used cars were disposed of by the plaintiff in the first part of 1947 at substantial profits.

32. Section 29.22(c)-2 of Treasury Regulations 111 (as amended by T. D. 5423, December 15th, 1944) provides two tests to which each inventory must conform— (1) It must conform as nearly as possible to the best accounting practice in the trade or business, and (2) It must clearly reflect income. This Section also provides that second hand goods taken in exchange should be valued at bona fide selling prices less direct cost of disposition whether cost price or market price is used as a basis for the valuation of such goods. Bona fide selling price means the actual offering of the goods during a period ending not later than 30 days after inventory date. In the present case plaintiff did, within 30 days of December 31st, 1946, dispose of 24 used cars which it had inventoried at $15,765.44, for $21,617.50, with none of the 24 cars being disposed of at a loss. Plaintiff had set up a reserve of $2,770 against these 24 cars. It appears that plaintiff did not value these cars at bona fide selling price less direct cost of disposition as provided in the Treasury Regulation noted above. Section 29.22 (c)-2 also provides that the method of valuing inventories by deducting from the inventory a reserve for price changes, or an

estimated depreciation in the value thereof, is not in accord with Treasury Regulations. It might be considered that the plaintiff in the present case was attempting to write off in one year at least a part of an anticipated loss in a subsequent year by means of this reserve method. The tax law provides for the deduction of a loss when sustained and does not allow the deduction of anticipated losses. The prudent business man may set up a reserve to cover anticipated losses or liabilities. However, a reserve for expenses or losses is not deductible as such from gross income by a cash basis taxpayer except in the year of payment. If the taxpayer is on the accrual basis, the reserve may be deducted from gross income only if there is a present liability to support the deduction.

33. There was testimony that the plaintiff expended labor and materials in reconditioning some of these used cars but that the cost of such reconditioning was usually not added on to the price at which the car was listed on the plaintiff's books. The plaintiff did not make any showing in regard to the value of such reconditioning process either for any individual used car or for the group as a whole. In the absence of such a showing the value of reconditioning these used cars cannot be given any great weight by the Court.

34. It is the view and finding of the Court that the plaintiff has not met the burden upon it of producing evidence to show that the determination of the Commissioner in restoring to income of the plaintiff for the year 1946 the sum of $5,649.75 as a result of an adjustment to used car reserve was clearly erroneous. In the absence of such evidence, the determination by the Commissioner must be and is sustained.

### Conclusions of Law

1. That this Court has jurisdiction of the subject matter of this action and the parties thereto under the provisions of Section 1340 of the Revised Judicial Code, 28 U.S.C.A. § 1340.

2. That the plaintiff has failed to establish its claim as to any part of the amount claimed by it in its complaint.

### Order for Judgment

It Is Hereby Ordered that Judgment shall be entered: 1. Rendering final judgment in favor of the defendant; 2. Assessing the taxable costs herein against the plaintiff.